**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ELIZABETH A. WALTON, | CASE NO. 1:23-cv-01408 |
| Plaintiff, | |
| | JUDGE JOHN R. ADAMS |
| vs. | |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Elizabeth A. Walton ("Plaintiff" or "Ms. Walton") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for application for Disability Insurance Benefits ("DIB") and Supplemental Security Insurance ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's final decision.

## I.      Procedural History

Ms. Walton concurrently filed her DIB and SSI applications on April 23, 2021.  (Tr. 17, 201-07, 208-16.)  She alleged a disability onset date of April 14, 2021.  (*Id.*)  She alleged disability due to diabetes, bradycardia, low blood pressure, fibromyalgia, stage 3 renal disease, anemia, heart issues, insomnia, high cholesterol, thyroid issues, depression and anxiety.  (Tr. 63, 73.)  After initial denial by the state agency (Tr. 107-11, 112-16) and denial upon reconsideration

1

(Tr. 124-28, 129-31), Ms. Walton requested a hearing (Tr. 156-61).  A telephonic hearing was held before an Administrative Law Judge ("ALJ") on August 24, 2021.  (Tr. 17, 38, 192.)  The ALJ issued an unfavorable decision on August 31, 2022, finding Ms. Walton not disabled.  (Tr. 14-33.)  The Appeals Council denied Ms. Walton's request for review of the ALJ's decision on May 24, 2023, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7.)  Ms. Walton then filed the pending appeal.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 8, 10, 11.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Walton was born in born in 1989.  (Tr. 27.)  She had at least a high school education.  (*Id.*)  She had past relevant work as a machine operator, pharmacy tech, and nurse aide.  (Tr. 58.)

### B.     Medical Evidence

Ms. Walton has severe physical and mental impairments that were identified by the ALJ (Tr. 19-20), but her appeal focuses on her mental impairments and the physical impairments that cause certain symptoms.  The evidence summarized herein focuses on those impairments.

#### 1.     Relevant Treatment History

##### i.     Physical Impairments

Ms. Walton was diagnosed and treated for non-Hodgkin's lymphoma (i.e., anaplastic large cell lymphoma) in 2000, at 11 years of age.  (Tr. 1717.)  She received anthracyline-based chemotherapy as well as autologous blood and marrow transplantation.  (Tr. 492, 1717.)  Ms. Walton had multiple long term health complications as a result of her cancer treatment.  (*See* Tr. 1717.)  For example, she underwent routine, serial echocardiograms at Ohio State due to cardiac complications from exposure to cardiotoxic chemotherapy.  (Tr. 497.)

Ms. Walton was diagnosed with insulin dependent diabetes mellitus in 2013.  (Tr. 1717.)

Her condition was originally diagnosed as Type 1 but later corrected as Type 2.  (*See* Tr. 602.)

On April 14, 2021, Ms. Walton presented to Mansfield Hospital to undergo a planned

supraventricular tachycardia ("SVT") ablation.  (Tr. 349-452.)  Cardiologist Mohammad Hajiri,

M.D., examined Ms. Walton and cleared her for the procedure, which he then performed.  (Tr.

349, 356.)  She underwent the ablation with no apparent complications, and about which Dr.

Hajiri reported: "[at] the end of the procedure, SVT was no longer inducible."  (Tr. 358.)  Post-

ablation electrocardiogram ("ECG") results at around 11:00 a.m. showed: normal sinus rhythm,

possible left atrial enlargement, and borderline ECG.  (Tr. 359.)   An echocardiogram ("ECHO")

was performed later the same day to reassess pericardial effusion.  (Tr. 362-63; 366-67.)  The

ECHO was reviewed by Sharon Roble, M.D., whose findings were: no pericardial effusion;

normal right ventricular size and systolic function; and normal left ventricular size and systolic

function with estimated ejection fraction of 55-60%.  (Tr. 363-64.)

Ms. Walton was examined later that day by Beth Ashley Seymour, CNP, who determined

that she had developed post-procedural hypotension, with a systolic blood pressure ("SBP") in

the 50's.  (Tr. 369.)  Ms. Walton reported lightheadedness with positional changes, chest

pressure that worsened when lying flat, and palpitations, but denied nausea, shortness of breath,

vomiting, or abdominal pain.  (Tr. 370.)  Objective examination findings were within normal

limits.  (Tr. 373.)  Ms. Walton was admitted for observation and to give her heart an opportunity

to recover.  (Tr. 376.)  Dr. Hajiri opined that Ms. Walton could need a dual chamber pacemaker

if her heart rate did not sufficiently improve.  (*Id.*)

While still hospitalized, Ms. Walton had an inpatient appointment on April 16, 2021,

with endocrinologist Cynthia Ann Dorsey, M.D.  (Tr. 383.)  The consult was ordered because PA

Mendenhall was concerned with Ms. Walton's diabetes management.  (Tr. 384.)  Dr. Dorsey reported that Ms. Walton had had "persistent bradycardia" since admission.  (*Id*.)  No changes were made to Ms. Walton's insulin pump settings because she was able to resume eating that day.  (*Id*.)  Sherry E. Habble, RN, met with Ms. Walton to provide diabetes self-management education.  (Tr. 388.)  While in the hospital, she also developed lower lobe pneumonia, for which she received intravenous and oral antibiotics as well as breathing treatments.  (Tr. 388-89.)

Ms. Walton was discharged by Dr. Ahmet Ayed Eid, M.D., on April 19, 2021.  (Tr. 388-89.)  Dr. Ayed reported that Ms. Walton was stable upon discharge and recommended: continued use of insulin pump; follow-up with nephrology regarding her Stage III Chronic Kidney Disease ("CKD"); and an electrophysiology study ("EP") in 30 days to monitor for potential need for pacemaker.  (Tr. 389-90.)  She was instructed to continue most medications but to stop taking several current prescriptions, including certain psychiatric, blood pressure, hormonal, and diabetes medications.  (Tr. 393.)  Dr. Ayed advised her to follow up with her primary care provider, cardiologist and endocrinologist.  (Tr. 397-98.)

On April 21, 2021, Ms. Walton was seen by Lisa Young, DNP, APRN-CNS, in Nephrology and Cardiology at University Hospital, for CKD III, hypotension, and diabetes.  (Tr. 456-60.)  Ms. Walton reported that all conditions were well-controlled at that time.  (Tr. 456.)  Physical examination findings were unremarkable and her blood pressure was 80/40.  (Tr. 460.)  Dr. Young noted that Ms. Walton "continue[d] to do well" and had stable kidney function; she recommended no changes and a follow-up in six months.  (*Id.*)

On April 26, 2021, Ms. Walton was seen in the OSU Medical Center Endocrinology, Diabetes and Metabolism Clinic for a telehealth appointment.  (Tr. 602-05.)  She was seen by endocrinologist Robert Rogers, APRN.  (Tr. 602.)  Ms. Walton reported neuropathy in her feet,

describing them as very numb with slight tingling.  (*Id.*)  APRN Rogers discussed continued diabetes and lipid maintenance, addressed needed refills, and recommended follow-up in about three months.  (Tr. 604-05.)

Ms. Walton was seen on April 27, 2021, by cardiologist Zeeshan Hussain, M.D., of University Hospitals, for tachycardia, inappropriate sinus tachycardia, and status post administration of cardiotoxic chemotherapy.  (Tr. 491-98.)  Dr. Hussain stated that the appointment was to be a second opinion regarding whether Ms. Walton should get a pacemaker. (Tr. 492.)  She reported episodes of palpitations, worsening fatigue following a sinus node modification procedure, lower extremity edema, and shortness of breath.  (*Id.*)  Ms. Walton stated that she had chronic and worsening shortness of breath and lower extremity edema.  (*Id.*) Her physical examination noted 1+ pitting edema in the bilateral lower extremities.  (Tr. 495.) Dr. Hussain found her presentation with worsening fatigue concerning given the recent SVT ablation and started a 30-day event monitor to assess heart function, ordered a cardiac stress test to assess the tachycardia, and recommended follow-up in one month.  (Tr. 491, 497-98.)

On April 28, 2021, Ms. Walton saw her primary care provider Rachel Mendenhall, PA-C, of University Hospitals, for a post-hospitalization follow-up visit.  (Tr. 502-07.)  The appointment addressed Ms. Walton's resolved right lower lobe pneumonia, Stage III CKD, fatigue, hypotension, hypothyroidism, inappropriate sinus tachycardia, and diabetes.  (*Id.*)  Ms. Walton reported lower extremity edema, chronic numbness and tingling, and anxiety with depression.  (Tr. 503-04.)  She denied shortness of breath.  (*Id.*)  Physical examination findings showed 1-2+ lower extremity edema.  (Tr. 507.)  Her blood pressure was 98/62.  (*Id.*)  No changes to treatment were made during the appointment.  (*See* Tr. 502-07.)

Ms. Walton presented to UH Samaritan Medical Center emergency department on May 14, 2021, and was treated by attending physician Mark Swift, D.O. (Tr. 996.) She was wearing a cardiac monitor at the time and had been informed by her doctor that she was having episodes of low heart rate and blood pressure. (*Id.*) Her doctor told her the monitor readings indicated she should go immediately to the emergency department. (Tr. 1000.) Her chief complaints were weakness, fatigue, and irregular heartbeats that at times took her breath away. (Tr. 996.) Dr. Swift ordered an array of tests, including chest x-rays which revealed mildly enlarged cardiac silhouette with mild increased pulmonary vascularity and blood work which revealed several abnormal findings. (Tr. 984-86, 1005-06, 1008.) Her blood pressure was 91/60. (Tr. 1001.) Dr. Swift summarized his findings as follows:

> Was able to obtain the records from the patient's cardiologist in Mansfield which shows several episodes of cardiac pauses, approximately 3-4 seconds each time per day. Patient's lab work today shows acute on chronic kidney failure with a BUN of 34 and a creatinine of 2.13 today. Previous lab work from January and February of this year shows a BUN of 20 and a creatinine of 1.1-1.4. I did discuss the case with Dr. Guha who feels that the patient should be transferred to Parma for emergent evaluation of pacemaker. Parma notes that they do not have beds and I subsequently talked to Dr. Ali from Elyria Hospital who agrees to accept patient. Patient has been resting comfortably in bed with heart rate holding in the low 100s. Patient's lab work and work-up here was otherwise unremarkable.

(Tr. 1009.)

Ms. Walton was then transferred to the emergency department at University Hospitals Elyria Medical Center. (Tr. 966.) She was admitted to Elyria Hospital and remained hospitalized until May 18. (Tr. 651-703, 1016-223.) During her admission, she had episodes in which her heartrate would drop to the 20s and 30s. (Tr. 660.) She underwent a permanent dual chamber pacemaker implantation on May 17 by Alberto Diaz, M.D. (Tr. 644, 666-68.)

Ms. Walton had a post-pacemaker implantation transthoracic echocardiogram on May 17, 2021. (Tr. 647-50, 1482.) The procedure was performed and read by John Schaeffer, M.D. (*Id.*)

6

Dr. Schaeffer's concluded that her cardiac function was within normal limits, except that the left ventricle showed "possibly mildly decreased estimated ejection fraction in the range of 45-50% without apparent obvious segmental wall motion abnormalities." (Tr. 1483.) She was discharged on May 18, 2021. (Tr. 1016.)

On May 25, 2021, Ms. Walton was seen by Lisa Young, DNP, APRN-CNP, of University Hospitals for follow-up for chronic kidney disease secondary to diabetes. (Tr. 1641-46.) NP Young reported that "her blood pressure [was] better controlled" since the pacemaker was implanted "however it [did] continue to be low." (*Id.*) Ms. Walton denied lightheadedness or dizziness and stated that her arrhythmias and palpitations had diminished a lot since getting the pacemaker, but endorsed increased nausea. (*Id.*) Examination findings were unremarkable but her vitals showed a blood pressure reading of 68/40. (Tr. 1643-46.)

On June 9, 2021, cardiologist Dr. Hussain saw Ms. Walton for a follow-up status post-placement of her cardiac pacemaker. (Tr. 1487-92.) Ms. Walton reported some improvement in exercise tolerance but said she was not back to normal. (Tr. 1487.) She also reported fatigue/dyspnea with moderate exertion, and occasional intermittent lower extremity edema. (*Id.*) Her blood pressure was 94/68. (Tr. 1491.) Her ECG showed sinus rhythm at a heart rate of 98. (Tr. 1492.) Follow-up was recommended in six months. (*Id.*)

On June 28, 2021, Ms. Walton saw PA Mendenhall for a one-month follow-up for low iron and white blood cell count. (Tr. 1510-21.) She reported general fatigue and weakness, stable lower extremity edema, and chronic numbness/tingling due to neuropathy, which was stable on Lyrica. (Tr. 1511-12.) Her physical examination findings were unremarkable, with reports of chronic pain and neuropathy. (Tr. 1516.) No changes were made to her course of treatment. (Tr. 1510-12.)

Ms. Walton had a follow-up nephrology appointment with NP Young on July 21, 2021. (Tr. 1647-52.)  She reported mild lower extremity edema and shortness of breath with exertion. (Tr. 1647.)  Mild lower extremity edema was confirmed upon physical examination.  (Tr. 1652.) NP Young opined that Ms. Walton was "stable from the renal point of view" and noted that "[h]er blood pressure does seem to be better controlled at this time."  (*Id.*)

On July 28, 2021, endocrinologist NP Rogers saw Ms. Walton for a follow-up visit.  (Tr. 716-19.)  Ms. Walton denied any significant complaints but reported that she continued to have very numb feet with slight tingling. (Tr. 716.)  NP Rogers made no changes to treatment or medication and recommended follow-up in three months.  (Tr. 719.)

On August 18, 2021, Ms. Walton was seen by cardiologist Dr. Diaz at North Ohio Heart/Ohio Medical Group of University Hospitals.  (Tr. 1383-92.)  She reported palpitations, which were confirmed on physical examination.  (Tr. 1385, 1389.)  Dr. Diaz stated that her pacemaker was functioning well, recommended risk factor modifications and lifestyle modifications like avoiding alcohol and excessive caffeine, and advised regular six-month device check-ups.  (Tr. 1385.)  Ms. Walton was started on Metoprolol Succinate ER.  (Tr. 1389.)

On September 1, 2021, Ms. Walton had a follow-up and medication management appointment with PA Mendenhall.  (Tr. 1522.)  PA Mendenhall noted, "pt is pursuing disability which I do believe she is an approp candidate give her extensive health history. . . ."  (Tr. 1524.) Ms. Walton reported general fatigue, weakness, and unexplained weight gain.  (*Id.*)  In a one-month follow-up appointment with PA Mendenhall on September 22, 2021, PA Mendenhall noted that Ms. Walton had been denied disability benefits and that she "question[ed] whether [SSA] received all the approp info on patient."  (Tr. 1534.)  She had gained about 20 pounds in 2

months, about 2 pounds in the last 3-4 weeks.  (Tr. 1535.)  Ms. Walton again reported general fatigue and weakness.  (*Id.*)

On October 29, 2021, NP Rogers saw Ms. Walton for an endocrinology/ diabetes follow-up.  (Tr. 743-46.)  She reported numbness and tingling in her feet. (Tr. 743.)  Her hemoglobin A1C level was 6.9—which Ms. Walton attributed to a stressful period of life—and her blood pressure was 98/66.   (Tr. 745.)  Her examination noted bilateral neuropathy of the feet with 10-gram monofilament testing.  (Tr. 746.)  Her treatment and medication regimen remained unchanged and NP Rogers advised a follow-up in about three months.  (*Id.*)

On December 8, 2021, Ms. Walton was seen by cardiologist Dr. Hussain.  (Tr. 787-800, 1473-86.)  Her chief complaint was shortness of breath, and she reported that her exercise tolerance had improved but was not back to normal.  (Tr. 1473.)   Dr. Hussain was uncertain of the current etiology for her exercise intolerance but stated that there was a possible component of deconditioning and noted that she had an elevated BNP.  (Tr. 800, 1486.)  Dr. Hussain reviewed her May 17, 2021 echocardiogram results and ordered a repeat echocardiogram, recommending a follow-up in six months.  (Tr. 1486.)

On December 15, 2021, Ms. Walton saw PA Mendenhall for a follow-up and medication management.  (Tr. 1553-75.)  She again reported general fatigue and chronic numbness/tingling due to neuropathy.  (Tr. 1559.)  Medication prescriptions were refilled and a three-month follow-up was recommended.  (Tr. 1557.)

The transthoracic echocardiogram ordered by Dr. Hussain on December 8, 2021, was performed on December 22, 2021.  (Tr. 1457.)  Results showed: low-normal left ventricular systolic function with 50-55% estimated ejection fraction; mild aortic valve regurgitation; device/defibrillator wire noted in right ventricle.  (1457-58.)

On January 12, 2022, Ms. Walton was seen in the comprehensive long-term follow-up clinic at Nationwide Children's Hospital as a former child cancer patient.  (Tr. 1717.)  No medical evidence from this visit was provided in the record.

On January 31, 2022, endocrinologist Roger Harty, M.D. treated Ms. Walton at Ohio State University Wexner Medical Center.  (Tr. 1708-15.)  She reported that her feet were very numb with slight tingling due to neuropathy.  (Tr. 1708.)  Her blood sugars were high and hemoglobin A1C was elevated, which Ms. Walton attributed to the combination of a recent 10-day course of steroids for bronchitis and a course of antibiotics for a drained abscess.  (Tr. 1712.)

On February 2, 2022, Ms. Walton saw NP Young for a follow-up appointment regarding her chronic kidney disease.  (Tr. 1653-59.)  NP Young reported that Ms. Walton's kidney levels had improved, she had much better blood pressure control and better controlled diabetes.  (Tr. 1653.)  Ms. Walton reported some dizziness and some blood pressures dropping into the high 80s but stated that "most of the time when she checks her blood pressure at home it is in the low 100s."  (Tr. 1654.)  She was advised to follow-up in six months.  (*Id.*)

Also on February 2, 2022, Ms. Walton had a follow-up cardiology appointment with Dr. Diaz in which she complained of shortness of breath with mild to moderate activity.  (Tr. 780-86, 1399-1414.)  Findings from a pacemaker device interrogation performed the same day indicated her pacemaker was functioning well but she still showed episodes of sinus tachycardia.  (Tr. 781.)  Because of Ms. Walton's mild renal dysfunction, Digoxin was contraindicated and Dr. Diaz started her on Flecainide instead.  (*Id.*)  Dr. Diaz opined that Ms. Walton should have a follow-up with her cardiologist, Dr. Hussain, early the next week to follow-up regarding her shortness of breath.  (Tr. 781, 1401.)  She was also instructed to get an ECG in Dr. Hussain's office on both February 7 and February 8.  (*Id.*)

Ms. Walton presented to the emergency department at University Hospital—Samaritan Medical Center on March 7, 2022.  (Tr. 1429-45.)  She complained that her arms felt very heavy when washing her hair that evening, and that she felt her heart quivering and beating in her chest for the past two weeks but was unable to obtain a pulse.  (Tr. 1429.)  She also reported shortness of breath and leg swelling, but denied chest pain.  (*Id.*)  On examination, Richard D. Andersen, D.O., found trace peripheral edema bilaterally, negative Homans sign, with no other remarkable findings. (Tr. 1431.)  An ECG was done in triage, and she was given a perfusion scan.  (Tr. 1429, 1431-32.)  No abnormal results were found.  (Tr. 1441.)  She was discharged as stable the same day and advised to follow-up with Dr. Hussain for her symptoms.  (Tr. 1443.)

On March 18, 2022, NP Young saw Ms. Walton for a follow-up regarding her chronic renal deficiency.  (Tr. 1660-66.)  Ms. Walton reported heart palpitations for which she was following up with cardiology.  (Tr. 1661.) She also stated that she was very symptomatic with activity secondary to shortness of breath for which she had to sit and rest for 5 to 10 minutes. (*Id.*)  NP Young noted that Ms. Walton was "very tearful" during the visit.  (*Id.*)  Her creatinine levels had increased.  (*Id.*)   A pulmonary function test (PFT) was ordered and NP Young stated that Ms. Walton would be referred to a pulmonologist if the results were abnormal.  (*Id.*)  Her blood pressure was 80/52.  (Tr. 1665.)  Ms. Walton had a PFT on March 30, 2022.  (*See* Tr. 1613 (reflecting PFT ordered on 4/5/22), 1681-82 (listing "restrictive pattern present on pulmonary function test" under *Diagnoses/Problems* from 5/4/22 pulmonology record).)

On March 23, 2022, Ms. Walton had an appointment with Amy Adkins, APRN-CNP, of University Hospitals for medication management and follow-up appointment on blood work results.  (Tr. 1591-1612.)  NP Adkins started Ms. Walton on an albuterol inhaler for her shortness of breath.  (Tr. 1591.)  Ms. Walton's lab results showed: anemia; elevated white blood

cell count; diabetes mellitus with peripheral neuropathy; and deficiencies in Vitamin B12 and D. (1591-93.)  NP Adkins referred her to hematology for anemia and elevated white blood cells. (Tr. 1593.)  NP Adkins refilled the prescription for Lyrica and reported that Ms. Walton's thyroid was stable.  (Tr. 1595.)  Follow-up was recommended in three months was recommended.  (*Id.*)

On March 23, 2022, Ms. Walton had a cardiology follow-up with Dr. Hussain.  (Tr. 1447-65.)  She reported that her palpitations had not improved and that she still had shortness of breath with exertion.  (Tr. 1448.)  Her dosage of Flecainide was increased, and Toprol was prescribed due to status post-pacemaker recurrent supraventricular tachyarrhythmias.  (Tr. 1465.) Dr. Hussain stated that Ms. Walton's exercise tolerance would have been expected to improve after the pacemaker implantation, and therefore he ordered a cardiopulmonary exercise test to address her "undifferentiated fatigue/dyspnea."  (*Id.*)

On April 5, 2022, PA Mendenhall saw Ms. Walton for a follow-up appointment.  (Tr. 1613-39.)  Ms. Walton requested FMLA paperwork for her husband to help with her care, and a handicap placard.  (Tr. 1615.)  Both requests were deemed appropriate and were granted.  (Tr. 1615, 1617.)  PA Mendenhall noted that Ms. Walton was recently advised by her hematologist to discontinue ferrous sulfate, and that she was recently diagnosed with moderate severe restrictive lung disease.  (Tr. 1615.)  She also noted: "pt is pursuing disability which I do believe she is an approp candidate give her extensive health history – unfort she was denied but I question if they received all the approp info on patient. . . ."  (*Id.*)

On April 20, 2022, Ms. Walton had a one-month nephrology follow-up with NP Young. (Tr. 1667-72.)  She continued to complain of palpitations and shortness of breath but denied lightheadedness or dizziness.  (Tr. 1667-68.)  Her blood pressure was 96/64.  (Tr. 1672.)

That same day, she had an initial consultation with pulmonologist Robert Piasecki, D.O., of University Hospitals.  (Tr. 1675-1680).  She was referred by NP Young and PA Mendenhall because of her abnormal PFT results from March 30, 2022, which was ordered due to her unexplained dyspnea upon exertion.  (Tr. 1675.)  The doctor's impressions included "dyspnea on exertion of unclear etiology at this time [and] fatigue."  (*Id*.)  He stated that he would be speaking with Ms. Walton's physician from Columbus Children's to discuss the situation.  (*Id.*)

Dr. Piasecki reviewed March 30, 2022 PFT results and compared them with January 12, 2021 PFT results, which were done pre-pacemaker "on a routine basis at Nationwide Children's Hospital in Columbus."  (Tr. 1676.)  He found that the spirometry numbers and lung capacity measures from both tests were very similar.  (*Id.*)  The March 30, 2022 PFT showed "moderately severe restrictive disease" with "lung volumes moderately reduced" with no change in airway resistance with the use of a bronchodilator.  (*Id.*)  Ms. Walton's single view chest x-ray from March 7, 2022, was clear, and the nuclear medicine lung scan from March 8, 2022, did not show definitive signs of pulmonary embolism.  (*Id.*)

On April 29, 2022, Ms. Walton had an endocrinology follow-up with NP Rogers.  (Tr. 1700-07.)  She reported fatigue, periodic shortness of breath, and changes in mood.  (Tr. 1702.)  Ms. Walton's blood pressure was 88/64.  (Tr. 1704.)  At a video follow-up visit with NP Rogers on June 9, 2022 (Tr. 1693-99), she again reported fatigue, periodic shortness of breath, and changes in mood (Tr. 1696).

At a follow-up pulmonology appointment with Dr. Piasecki on May 4, 2022, Ms. Walton continued to report shortness of breath with exertion.  (Tr. 1681-82.)  Dr. Piasecki noted that Ms. Walton had recent undergone cardiopulmonary stress test performed at University Hospitals, but that he had not yet received a report with the results.  (Tr. 1682.)  Dr. Piasecki also stated that he

had spoken with the head of bone marrow transplant clinic at Columbus Children's and discussed Ms. Walton's abnormal PFT results from 2021 (pre-pacemaker) and 2022 (post-pacemaker).  (*Id.*)  The doctors opined that Ms. Walton's shortness of breath "could be a result of the full body radiation that she had as an adolescent when doing the bone marrow transplant." (*Id.*)  Dr. Piasecki told Ms. Walton that he would contact her as soon as he had her stress test results and advised her to consider making an appointment with Dr. Bajwa at Children's Hospital to discuss her case and ask about further recommendations.  (Tr. 1681.)

On June 23, 2022, Ms. Walton saw pulmonologist Vincent Esguerra, M.D., of Lung Care Outpatient Care East.  (Tr. 1688.)  The appointment addressed Ms. Walton's continued complaints of shortness of breath.  (*Id.*)  She reported dyspnea with walking fast or far, or when cleaning her house, but no issues when at rest.  (*Id.*)  She said she was not involved in exercise. (*Id.*)  Physical examination findings were unremarkable.  (Tr. 1689.)  Based on her history and physical examination, Dr. Esguerra opined that her dyspnea was likely multifactorial, and noted that she did not have symptoms—e.g., basilar cracks—of interstitial lung disease.  (Tr. 1691.) But because of her full body radiation, he planned to get an updated CT scan of the chest to evaluate for any interstitial process.  (*Id.*)  Dr. Esguerra advised Ms. Walton that the most common cause of restrictive lung physiology was "chest wall compression from abdominal and thoracic adipose tissue."  (*Id.*)  He went on to opine that "generalized deconditioning [was] possibly playing a role" in her condition.  (*Id.*)  To counteract generalized deconditioning, Dr. Esguerra "discussed alternative [exercise] such as swimming or starting at a minimal exertion and slowly working [her] way up."  (*Id.*)  He also discussed her psychiatric diagnoses of anxiety and depression, stating that these could have been playing a role in causing her sensation of shortness of breath and easy fatigability.  (*Id.*)

14

In order to clarify her diagnosis, Dr. Esguerra reported that he would order: an updated chest CT scan given her history of full-body radiation; updated pulmonary function test; 6-minute walk data; and arterial blood gas lab. (Tr. 1691.) He recommended a follow-up visit in four weeks. (Tr. 1688, 1692.) This visit is the last in-time medical record provided.

### ii. Mental Impairments

Ms. Walton's only mental health treatment was medication management for depression and anxiety through her primary care provider, PA Mendenhall. (*See, e.g.*, Tr. 1511-12, 1524.) As of June 28, 2021, Ms. Walton reported anxiety and depression and took Zoloft and Buspar for her mood. (Tr. 1511-12.) On April 5, 2022, Ms. Walton scored 9 out of 10 on preventative testing for depression (moderate depression); PA Mendenhall noted she was "stable on meds" and the depression was "more situational with her health." (Tr. 1617.)

Ms. Walton often reported depression and anxiety in her medical appointments. (*See, e.g.*, Tr. 504, 510, 519, 528, 537, 550, 563, 569, 1083, 1095, 1505, 1512, 1524, 1535, 1559 1621.) Her providers generally noted appropriate mood and affect. (*See e.g.*, Tr. 460, 465, 471, 477, 482, 507, 514, 522, 532, 540, 554, 567, 573, 833, 1358, 1499, 1509, 1516, 1530, 1540, 1552, 1569, 1605, 1631, 1646, 1652, 1658, 1666, 1673.) She reported mood changes on April 29, and June 9, 2022. (Tr. 1696, 1702.) She also frequently reported fatigue. (*See* Tr. 492, 502-07, 730, 1465, 1487, 1524, 1535, 1559, 1617, 1619, 1660-66, 1676, 1696, 1702.)

### 2. Opinion Evidence

### i. Psychological Consultative Examiner

On August 12, 2021, consultative psychological examiner James C. Tanley, Ph.D. completed a disability assessment report. (Tr. 704-10.) Dr. Tanley, a clinical psychologist and neuropsychologist, conducted a clinical interview and reviewed a self-report submitted by Ms. Walton. (Tr. 705.) Ms. Walton reported that she lived with her husband and had no children.

15

(Tr. 706.)  She had done some college level work, earning certificates in phlebotomy and pharmacy tech.  (*Id.*)  She graduated high school with an individualized education program ("IEP"), because of her cancer.  (*Id.*)  When asked about social relations, Ms. Walton said she did well with others.  (*Id.*)  Ms. Walton reported leaving the workforce because of her heart problems and cited shortness of breath as the reason she could not work.  (Tr. 706.)  In past jobs, she dealt with on-the-job stress by talking to a friend at work.  (*Id.*)  She had never sought mental disability leave from work, and no employers had referred her for mental health treatment.  (*Id.*)

As to behavioral health history, Ms. Walton had never been psychiatrically hospitalized nor seen a mental health professional on an outpatient basis.  (*Id.*)  Asked about her current emotional status, Ms. Walton told Dr. Tanley that she had anxiety and depression.  (*Id.*)  This made her "wonder why [she was] here," "get down, cry, stay in bed."  (*Id.*)  She also had trouble breathing, got fluttery, shaky, and would clench up.  (*Id.*)  Ms. Walton said that her psychiatric medications—Buspirone, Amitriptyline, and Sertraline—helped, "mostly."  (*Id.*)

Ms. Walton's activities of daily living (ADLs) included waking up, letting her dogs outside, doing dishes, having lunch, cleaning her home, and grocery shopping.  (Tr. 707.)  She had no hobbies, belonged to no church or clubs, and did not read for pleasure.  (*Id.*)  Ms. Walton watched some television, listened to the radio in the car, and used the internet.  (*Id.*)  She went to sleep between 10 and 11 p.m. but may not sleep until at least midnight.  (*Id.*)

Upon mental status examination, Ms. Walton's appearance and behavior were unremarkable.  (Tr. 707.)  Her speech had no noted anomalies and she did not display unusual content, such as paranoia or delusion.  (*Id.*)  Her affect and mood were appropriate, but she reported anhedonia with mood problems.  (*Id.*)  She exhibited no higher than average intellectual functioning.  (*Id.*)  Her insight and judgment were unremarkable, and she understood the purpose

16

of the examination.  (*Id.*)  She reported longstanding problems with anxiety and depression, and said she was symptomatic in spite of psychoactive medications.  (*Id.*)  Dr. Tanely concluded that "[s]elf-report data appear[ed] reliable" as Ms. Walton did not show significant inconsistencies or report unusual symptoms or improbable combinations of symptoms.  (Tr. 708.)  As to her prognosis, Dr. Tanley found the likelihood of "amelioration and deterioration of symptoms [was] about equal."  (*Id.*)

In his Functional Assessment, Dr. Tanley opined as follows:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.** The claimant had no difficulty with this throughout the course of the CE. Her verbal intellectual functioning is estimated to be no higher than Average, and this is what would be expected of her in a work setting.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multistep tasks.** This was unimpaired during the interview portion of the exam. She responded appropriately and in timely fashion to all examiner questions. Given that her verbal intellectual functioning is estimated to be no higher than Average, she would be expected to show little or no difficulty with tasks of increasing complexity and multistep tasks. Were her mood problems, anhedonia, and/or anxiety to worsen, they could negatively impact this domain by interfering with her ability to focus and to concentrate.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.** The claimant made an unremarkable social presentation in this setting today. She said she does well with people. However, her current mood problems, anhedonia, and/or anxiety could make the free and easy commerce of social interaction on the job slightly problematic.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.** There is no reported history of mental or emotional deterioration in response to work exposure.  Her current mood problems, anhedonia, and/or anxiety could be expected to lower her frustration tolerance somewhat and put her a bit at risk for the pressures of work.

(Tr. 709 (emphasis added).)

### ii.     State Agency Psychological Consultants

On September 1, 2021, state agency psychological consultant, Paul Tangeman, PhD, completed a Psychiatric Review Technique ("PRT") (Tr. 65-66, 76) and mental RFC assessment (Tr. 69-70.)  In the PRT, he concluded that Ms. Walton had mild limitations in his ability to understand, remember, or apply information and moderate limitations in his ability to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 66, 76.)  In the RFC, Dr. Tangeman opined that Ms. Walton was capable of: routine tasks that are not fast paced; superficial interaction with others; and working in environments where changes are expected and explained.  (Tr. 69-70, 79-80.)

On reconsideration on December 28, 2021, state agency psychological consultant Aracelis Rivera, M.D., affirmed Dr. Tangeman's PRT (Tr. 88, 98) and mental RFC findings (Tr. 91-92, 101-02).

### iii.     State Agency Medical Consultants

On July 29, 2021, state agency medical consultant Indira Jasti, M.D., completed a physical RFC assessment opining that that Ms. Walton was able to: perform light exertional work; frequently stoop, kneel, crouch, or crawl; occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; and must avoid all exposure to hazards such as unprotected heights and heavy machinery.  (Tr. 67-69, 77-79.)

On reconsideration on March 4, 2022, state agency medical consultant Steve McKee, M.D., affirmed Dr. Jasti's findings except that that Dr. McKee found Ms. Walton could only occasionally crawl.  (Tr. 89-91, 99-101.)

18

### iv.    Treating Sources

<u>Rachel Mendenhall, PA-C</u>

Ms. Walton's primary care provider PA Mendenhall completed a letter dated July 27,

2022, which stated:

> Please take into consideration that Elizabeth Walton has been a patient in this office
> for years. She suffers from multiple medical conditions and needs to follow often
> with specialists to help manage these conditions and improve her quality of life.
> Please take all this into consideration as you review her disability case.

(Tr. 1716.)

<u>Rajinder P. S. Bajwa, M.D.</u>

Pediatric hematologist/oncologist Dr. Bajwa provided a one-page letter dated August 16,

2022, in which he stated that Ms. Walton "had anaplastic large cell lymphoma and underwent an

autologous blood and marrow transplantation (ABMT) on 3/24/200." (Tr. 1717.)  He also

reported that Ms. Walton "ha[d] multiple long-term complications and [was] followed by various

medical providers at Columbus, Mansfield and Cleveland." (*Id.*)  He noted that she was last seen

at Nationwide Children's Hospital on January 12, 2022 for the following diagnoses:

Hypothyroidism; Mitral Valve prolapse/tachycardia; Status post-surgery for bilateral cataracts;

Insulin dependent diabetes; Dyslipidemia (with history of metabolic syndrome)—worsening

secondary to diabetes; Diabetic neuropathy; Irritable Bowel Syndrome with history of refractory

C Diff status post fecal transplant; Primary ovarian failure; Depression; Vitamin D Deficiency--

on treatment; Status post removal of all teeth. (*Id.*)

### v.    Functional Capacity Evaluation

On October 26 and 27, 2021, Karen Rittenhouse, OTR/L, completed a Functional

Capacity Evaluation ("FCE") for which she provided a report dated November 19, 2021.  (Tr.

729-37.)  OT Rittenhouse reported that Ms. Walton was cooperative and "was willing to work to

19

maximum abilities in all test items" and had consistent limitations related to shortness of breath and fatigue, but did not report pain.  (Tr. 730.)

Clinical findings showed: significant bilateral hand weakness; blood pressure that decreased with activity; and that Ms. Walton's heart rate continued to increase for at least one minute following exertion and returned to resting heartrate after 1 to 2 minutes.  (Tr. 730, 736.)  On physical examination, Ms. Walton had an unsteady gait pattern and appeared wobbly but had normal coordination.  (Tr. 734.)  There was slight increased edema in the bilateral lower extremities following activity.  (*Id.*)  Her blood pressure was 72/58 after waist to floor lift task and increased to 99/63 after 3 minutes of sitting.  (Tr. 736.)  Her blood sugar level dropped to 65 after lifting, carrying, and stair climbing tasks.  (*Id.*)

Based on the examination, OT Rittenhouse opined that Ms. Walton had the following abilities: frequent sitting; occasional elevated work, forward bending-standing, standing work, crouching, kneeling, stairs, ladder climbing, and walking; maximum waist to floor lift of 40 lbs.; maximum waist to crown lift of (handles) 30 lbs. and (preferred hand) 32 lbs.; maximum front carry of 45 lbs.; push force of 70 lbs.; pull force of 69 lbs; and average bilateral hand gross motor and find motor coordination skills.  (Tr. 731.)  OT Rittenhouse also opined that he had the following limitations: significant bilateral hand weakness; blood pressure decreases with activity; heart rate continues to increase for at least one minute following exertion and takes 1-2 minutes to return to resting heart rate; and continuous monitoring of blood sugar levels is needed.  (*Id.*)

## C.    **Function Report**

Ms. Walton provided an Adult Function Report, dated May 24, 2021.  (Tr. 251-58.)  She stated that blood sugar issues made her unable to work because he became dizzy or lightheaded

when they were too low or high; low blood pressure also made her dizzy.  (Tr. 251.)  Ms. Walton also reported pain from diabetic neuropathy.  (*Id.*)

She reported that a typical day involved getting dressed, letting animals outside, making food, watching television, showering, making dinner, and going to sleep.  (Tr. 252.)  She did not care for any other people and her care of animals involved feeding pets, letting them outside, bathing them, and providing water. (*Id.*)  She used to be able to work, go to the gym, and play with her nieces and nephews.  (*Id.*)  She had to check blood sugar in the middle of the night and was unable to sleep at times.  (*Id.*)  Ms. Walton did not have problems with personal care. (*Id.*)  She used timers and bill boxes to help take her medicine.  (Tr. 253.)  She prepared her own meals, which were generally sandwiches and frozen boxed meals.  (*Id.*)  She prepared food or meals a few times a week and it usually took her 30 minutes or longer.  (*Id.*)  She did dishes and laundry and mowed the lawn, spending a couple hours a day on these types of activities.  (*Id.*)

Ms. Walton went outside daily, drove a car, and was able to go out alone.  (Tr. 254.)  She shopped in stores, by phone, and on the computers; she shopped for groceries and cleaning supplies, and this took a few hours once a week.  (*Id.*)  She was able to manage her finances.  (*Id.*)  Her hobbies were: reading, watching television, and riding an ATV, but she did not ride the ATV anymore because it was too strenuous on her heart.  (Tr. 255.)  Social activities included in-person, phone calls, email, texting, mail and video chat.  (*Id.*)  She was social every day but she no longer had the energy to get out and socialize much.  (*Id.*)  Ms. Walton went to the store or gas station on a regular basis.  (*Id.*)

Ms. Walton reported that her conditions affected her abilities to: lift, walk, climb stairs, as well as her memory and concentration.  (Tr. 256.)  The physical limitations were a result of her trouble breathing and shortness of breath.  (*Id.*)  Her memory and concentration had been

affected since chemo and radiation.  (*Id.*)  She could walk 10 yards before needing three or four minutes to catch her breath.  (*Id.*)  She could pay attention for five minutes.  (*Id.*)  She finished what she started, followed written instructions "pretty well," and was better with written or demonstrations than verbal instructions, and got along with authority figures "very well."  (*Id.*)  But she handled stress and changes in routine "poorly."  (Tr. 257.)

**D.    Hearing Testimony**

**1.    Plaintiff's Testimony**

Ms. Walton testified in response to questioning by the ALJ and her representative at the August 21, 2022 hearing.  (Tr. 34-62.)  She previously worked as nurse aide and pharmacy technician, in a factory, and in a pizza parlor.  (Tr. 40-45.)  She left her factory work making machine parts because of low blood pressure and dizziness; she was taken to the emergency department from work after blacking out and was hospitalized for four days.  (Tr. 43-44.)

Ms. Walton said her medical problems went "hand-in-hand," affecting one another.  (Tr. 46.)  When her blood pressure dropped, it affected her kidneys.  (*Id.*)  She was struggling with breathing even with small amounts of exertion.  (*Id.*)  She had insomnia.  (Tr. 46-47.)  She also had side effects from some of her medications; for example, some medications increased her anxiety, and one of her heart medications affected the rhythm of her heart.  (Tr. 47.)

Ms. Walton went to the grocery store about once a week and sometimes had to use a motorized scooter because she "d[idn't] have it in [her] to shop."  (Tr. 47.)  She was not in counseling.  (Tr. 47-48.)  She could go up and down stairs.  (Tr. 48.)  She attended to her own personal care, but sometimes needed to stop and rest when her blood pressure became low.  (*Id.*)  She could walk about 25-minutes without stopping, stand for 15-20 minutes, and sit for 45-60 minutes.  (Tr. 48-49.)  In a typical day, Ms. Walton got up and dressed, ate breakfast, watched

TV, and let her dogs outside.  (Tr. 49.)  She made lunch, and prepared dinner with her husband's help.  (*Id.*)  She tried to pick up the house or do a little bit of laundry and then went to bed.  (*Id.*)  She liked to read and watch dirt track racing on television.  (*Id.*)

When Ms. Walton became dizzy, it lasted up to ten minutes.  (Tr. 49.)  She was on blood pressure medication to help keep her blood pressure up.  (*Id.*)  She was seeing a lung doctor for breathing issues.  (Tr. 50.)  She was also seeing a throat doctor to see whether her throat was opening enough to get breath in.  (*Id.*)  She had pulmonary function tests showing moderately severe restrictive lung disease, so she was seeing doctors to address that.  (*Id.*)  The restrictive lung disease was diagnosed the year before at Columbus Children's, where she went for cancer treatment follow-ups.  (*Id.*)  The diagnosis was confirmed by a 2021 pulmonary function test.  (*Id.*)  Dust, fumes, and odors affected her breathing.  (Tr. 50-51.)

In testimony from questioning by her representative, Ms. Walton confirmed that she had cancer in 2000.  (Tr. 51.)  Her pacemaker was working correctly, and she went every six months for a device check.  (*Id.*)  She had an insulin pump for diabetes, which was working well.  (Tr. 52.)  She had neuropathy in her feet and calves due to diabetes.  (*Id.*)  She had a fecal transplant to treat her irritable bowel syndrome.  (Tr. 52.)  She still had trouble controlling her bowels, and when she lost control, it was usually at night.  (*Id.*)  Ms. Walton had bowel accidents a few times a week.  (*Id.*)  She was on medication to increase the pancreatic enzymes in her bowels.  (*Id.*)  She also had Stage Three Kidney disease, which was related to her low blood pressure.  (Tr. 53.)  Her kidneys were being monitored but she did not need dialysis.  (*Id.*)

The problems with her organs were likely related to her radiation treatment for cancer as a child, which was given to prepare her body for a bone marrow transplant.  (Tr. 54.)  Providers believed her current medical problems represented long term effects from that radiation which

23

would worsen over time. (*Id.*)  Ms. Walton was also at a high risk for developing a new cancer and was tested frequently when cancer was suspected. (Tr. 54-55.)  She was on about 20 different medications to stabilize her conditions; there was no real cure. (Tr. 55.)

Ms. Walton was employed for many years and left the workforce after her heart issues worsened. (Tr. 55.)  At that time, her resting heart rate was about 120 and her heart doctor (an electrophysiologist) had tried heart ablations to improve this. (*Id.*)  When Ms. Walton had the ablations, there would be issues with her heart's rhythm becoming irregular. (Tr. 55-56.)  After an ablation and cauterization procedure in March 2021, her resting heartbeat dropped to about 39 and her blood pressure dropped to the 50s. (Tr. 56.)  Ms. Walton received a heart monitor and was told that she should probably not go back to work because her heart was fragile. (*Id.*)  After this, her heart began to have pauses in its rhythm and shorty after she went to the ER due to her heart rhythm and was transferred to a hospital where a pacemaker was implanted. (*Id.*)

### 2.     Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. (Tr. 57.)  The VE testified that Ms. Walton's past work included: machine operator, a semi-skilled, medium-exertional job; pharmacy technician, a semi-skilled, light-exertional job; and nurse aide, a semi-skilled, medium-exertional job. (Tr. 58.)  The VE testified that a hypothetical individual of Ms. Walton's age, education, and work experience and with the functional limitations described in the ALJ's RFC determination could not perform her prior work, but could perform representative positions in the national economy, such as: inspector; sorter; and order clerk. (Tr. 59.)  Asked whether an additional limitation of "superficial interaction"—defined by the ALJ as interactions would be limited to straightforward exchanges without negotiation, persuasion, conflict, resolution, close teamwork, tandem work or over the shoulder supervision—the VE stated that

the same jobs would still be available even with this limitation.  (*Id.*)  The VE testified that two absences per month would be work preclusive, and that employers would tolerate at most one absence per month.  (Tr. 60.)  The VE also testified that it would be work preclusive if the individual was off task 15% of the workday or required two additional breaks per workday.  (*Id.*)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

### IV.      The ALJ's Decision

In his August 31, 2022 decision, the ALJ made the following findings:[1]

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2026.  (Tr. 19.)

2.      The claimant has not engaged in substantial gainful activity since April 14, 2021, the alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: status-post anaplastic large cell lymphoma; mitral valve prolapse; hypotension; restrictive lung disease; chronic kidney disease; diabetes mellitus; obesity; depression disorder and anxiety disorder.  (Tr. 19-20.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20.)

5.      The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except occasional climbing ramps and stairs; no climbing ladders, ropes or scaffolds; occasional stooping, kneeling, crouching and crawling and no exposure to workplace hazards, such as unprotected heights or dangerous, unprotected moving mechanical parts and occasional exposure to concentrated irritants such as dust, odors,

---

[1] The ALJ's findings are summarized.

fumes and other pulmonary irritants. The claimant is further limited to work that is not at a production rate pace, such as one has with assembly line work; occasional changes in duties and the work setting.  (Tr. 22.)

6.  The claimant is unable to perform any past relevant work.  (Tr. 26.)

7.  The claimant was born in 1972 and was 48 years old, defined as a younger individual age 18-49, on the date the application was filed.  (Tr. 27)

8.  The claimant has at least a high school education.  (*Id.*)

9.  Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including inspector, sorter, and order clerk.  (*Id.*)

Based on the foregoing, the ALJ determined that Ms. Walton opez had not been under a disability, as defined in the Social Security Act, since April 14, 2021, alleged onset.  (Tr. 28.)

## V.  Plaintiff's Arguments

Ms. Walton presents two assignments of error.  First, she argues that the ALJ erred in evaluating the evidence, which she avers supports "greater nonexertional limits."  (ECF Doc.8, p. 1.)  Second, she argues that the ALJ erred in evaluating of the opinions of her treating sources—PA Mendenhall and Dr. Bajwa—and failing to support the RFC with substantial evidence.  (*Id.*)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by
substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the
Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245
F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less
than a preponderance and is such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030
(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th
Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence
shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)
(citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a
zone of choice within which the decisionmakers can go either way, without interference by the
courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).
Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide
questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if
substantial evidence supports a claimant's position, a reviewing court cannot overturn the
Commissioner's decision "so long as substantial evidence also supports the conclusion reached
by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit
has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to
follow its own regulations and where that error prejudices a claimant on the merits or deprives
the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651
(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

28

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether ALJ Properly Accounted for Non-Exertional Physical Limitations**

In her first assignment of error, Ms. Walton argues that the ALJ did not appropriately evaluate the evidence supporting additional non-exertional limitations resulting from her physical impairments.  (ECF Doc. 8, p. 12.)  Specifically, she asserts that the ALJ: (1) failed to properly evaluate her subjective complaints of lightheadedness, shortness of breath, and dizziness (*id.* at pp. 12-17); (2) "did not consider the frequency of treatment and potential for absenteeism" in adopting the RFC (*id.* at pp. 17-18); and (3) "failed to cite anything contradicting [her] allegations regarding the need for additional breaks and rest periods" (*id.* at pp. 18-20).  The undersigned will address the first and third arguments together, as both focus on the ALJ's consideration of Ms. Walton's subjective complaints.  The second argument—which focuses on the ALJ's RFC finding—will be addressed separately.

**1.      Whether ALJ Properly Considered Subjective Symptoms**

Ms. Walton argues first that the ALJ failed to appropriately evaluate her subjective reports of lightheadedness, shortness of breath, and dizziness because he did not consider all of the evidence relating to those symptoms and did not "provide a specific enough explanation of *why* he found [her] complaints inconsistent with the medical evidence."  (ECF Doc. 8, pp. 12-17 (emphasis in original).)  She argues second that the ALJ "failed to cite to anything contradicting [her] allegations regarding the need for additional breaks and rest periods."  (*Id.* at pp. 18-20.)  The Commissioner argues in response that the ALJ appropriately evaluated Ms. Walton's

subjective reports and that Ms. Walton has not met her burden to show that the evidence required the ALJ to come to a different conclusion.  (ECF Doc. 10, pp. 5-7.)

### i.     Legal Standard for Evaluation of Subjective Symptoms

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also Alexander v. Kijakaz*i, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); see also 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 23), so the discussion below will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ considers objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. 404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and

30

effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. 404.1529(c)(3).

### ii.  Whether ALJ Appropriately Addressed Allegations of Dizziness, Shortness of Breath, and Lightheadedness

Ms. Walton does not dispute that the ALJ acknowledged her complaints of low blood pressure, lightheadedness, shortness of breath, and dizziness (ECF Doc. 8, p. 12 (citing Tr. 23)), but contends that the ALJ failed to provide a sufficient explanation for why he found the complaints inconsistent with the medical evidence and did not consider all of the relevant evidence (*id.* at pp. 12-14).  The undersigned does not find this argument to be well taken.

The record reflects that the ALJ considered Ms. Walton's reports of shortness of breath with exertion, loss of breath with exposure to dust and odors, and drops in blood pressure when on her feet a lot, with drops in blood pressure causing dizziness, lightheadedness, and/or a need to sit down.  (Tr. 23.)  Nevertheless, the ALJ found that Ms. Walton's "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [we]re not entirely consistent with the medical evidence and other evidence" because the statements were "not supported by the evidence of record," explaining: "while [Ms. Walton's] conditions pose some limitations, they do not preclude the range of work described" in the RFC.  (Tr. 23-24.)

In support, the ALJ outlined the relevant medical evidence, including: Ms. Walton's childhood cancer treatment; her cardiac ablation with hospitalization in April 2021; her implant of a pacemaker in May 2021 due to palpitations, edema, fatigue, and shortness of breath; her subsequent cardiac improvement, but with continued complaints of exercise intolerance, fatigue, and dyspnea; her pulmonary function study showing "moderately severe restrictive disease" and moderately reduced lung volumes, similar to a pre-pacemaker study; her decreased breath sounds

31

on examination; her treatment with a pulmonologist for chronic shortness of breath despite the

resolution of her tachycardia; the stabilization of her chronic renal insufficiency following her

pacemaker implantation; and the stabilization of her diabetes and diabetic neuropathy with

treatment.  (Tr. 24.)  The ALJ described her post-pacemaker pulmonology visit as follows:

> The claimant was also evaluated at OSU Lung Care for chronic shortness of breath.
> She reported that she was told her dyspnea was related to tachycardia, but since
> that has resolved, she feels that her shortness of breath is getting worse. The
> claimant reported becoming short of breath when walking at a fast pace or far
> distance, but at rest she is fine. The pulmonologist indicated that based on the
> claimant's physical examination, there was no concern for interstitial lung disease,
> and she did not appear to have an obstructive process that would benefit from
> inhaler therapy. He further noted that the most common cause of restrictive lung
> physiology is chest wall compression from abdominal and thoracic adipose tissue
> suggesting that generalized deconditioning was playing a role in the claimant's
> dyspnea (Exhibit 20F/2-5).

(Tr. 24 (citing Tr. 1688-91).)  Having considered the medical records, the ALJ explained:

> While the claimant undoubtedly has a significant medical history with several
> medical issues following her cancer treatment, the record indicates that these
> conditions appear to be relatively stable. Following the placement of the claimant's
> pacemaker there is no evidence of ongoing cardiac issues or subsequent
> complications. In fact, treatment notes indicate that the claimant's tachycardia is
> resolved (Exhibit 20F/2).   Although, the claimant continues to report shortness of
> breath, it has not been attributed to specific lung disease. Moreover, the
> evidence reflects that the claimant's shortness of breath is brought on by standing or walking
> for long periods and absent when she is at rest. Thus, work at the sedentary
> exertional level is supported. . . .  [W]hile the claimant's history and impairments
> result in residual symptoms that impact her ability to work, the totality of the
> evidence, supports the residual functional capacity adopted herein. Specifically, the
> claimant is limited to work at the sedentary exertional level with the above postural
> and environmental limitations given the nature and extent of the combination of
> her cardiac history, ongoing shortness of breath, deconditioning and potential for
> fatigue and dizziness related to diabetes, hypotension and chronic kidney disease. .
> . . The record does not contain evidence of abnormal findings sufficient to
> document any further limitations during the relevant period.

(Tr. 25 (citing Tr. 1688).)  The ALJ also considered the medical opinion evidence.  (Tr. 25-26.)

In arguing that the ALJ did not consider all the relevant evidence and offered an

insufficient explanation for his subjective symptom analysis, Ms. Walton points first to a single

medical record cited by the ALJ and argues: "the one page cited by the ALJ for rejecting [her] physical complaints did not support the ALJ's rationale." (ECF Doc. 8, pp. 14-15 (citing Tr. 25, 1688)). The ALJ cited the record at issue in support of his observation that "treatment notes indicate that the claimant's tachycardia has resolved." (Tr. 25 (citing Tr. 1688).) This is an accurate characterization of the record. (*See* Tr. 1688.) Ms. Walton does not dispute that the record says her tachycardia had resolved but argues instead that the record shows she complained of chronic shortness of breath at that visit, worsening since her pacemaker was implanted. (ECF Doc. 8, *Id.* at pp. 14-15.) While that is also an accurate characterization of the record, the ALJ specifically acknowledged those same complaints in his earlier discussion of the same medical record. (Tr. 24.) An ALJ is permitted to rely on previously articulated information to support her opinion analysis. *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec*., 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). Ms. Walton has not shown that the ALJ mischaracterized or failed to consider the specified medical record, or that he failed to appropriately articulate his analysis of that record.

Ms. Walton also argues that the ALJ offered insufficient explanation for his subjective symptom analysis because he "was not free to discount [her] shortness of breath because it was not 'attributed to a specific lung disease'" (ECF Doc. 8, pp. 15-17 (citing Tr. 25)). In support, she notes that the ALJ found restrictive lung disease to be a severe medically determinable impairment, and that the objective evidence reflects that she continued to treat with specialists for "unimproved complaints" of shortness of breath. (*Id.* at p. 15.) She cites to various medical records in support, but without specifically identifying which—if any—records or findings the ALJ either mischaracterized or failed to consider. (*Id.* at 15-17.)

Contrary to Ms. Walton's argument, a review of the ALJ decision reveals that the ALJ did not simply "discount" her complaints of shortness of breath because they were not attributed to a specific lung disease.  Instead, the ALJ acknowledged her complaints of worsening shortness of breath, her decreased breath sounds on examination, and the study showing moderately severe restrictive disease, but noted that her pulmonologist found "no concern for interstitial lung disease," that "she did not appear to have an obstructive process that would benefit from inhaler therapy," and that "generalized deconditioning was playing a role in [her] dyspnea."  (Tr. 24, 25.)  The ALJ also noted Ms. Walton's own report to her pulmonologist that she became short of breath walking at a fast pace or a far distance but was "fine" when at rest.  (Tr. 24 (citing Tr. 1688), 25.)  Nevertheless, the ALJ limited Ms. Walton to the performance of sedentary exertional work with limited climbing, postural positions, and exposure to concentrated pulmonary irritants because of her "cardiac history, ongoing shortness of breath, deconditioning and potential for fatigue and dizziness related to diabetes, hypotension and chronic kidney disease."  (Tr. 22, 25.)  This RFC marked a reduction in exertional level compared to the opinions of the state agency medical consultants (Tr. 25-26) and a reduction in lifting and carrying limitations compared to the functional capacity evaluation (Tr. 26).

The undersigned finds Ms. Walton's argument that the ALJ did not adequately articulate his findings regarding her subjective complaints of dizziness and shortness of breath is without merit.  Ms. Walton argues the evidence supports a finding that the symptoms were more limiting than the ALJ found them to be, but it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Ms. Walton has not met her burden to show that the ALJ erred in his analysis of her subjective complaints, and the ALJ adequately explained his reasons for finding those subjective complaints were not

entirely consistent with other evidence in the record.  The undersigned therefore turns to Ms. Walton's second argument regarding her subjective complaints, the need for additional breaks.

### iii.      Whether ALJ Appropriately Addressed Need for Breaks

Ms. Walton argues next that the ALJ "failed to cite to anything contradicting [her] allegations regarding the need for additional breaks and rest periods." (ECF Doc. 8, p. 18.)  In support, she cites to various subjective reports that she struggled for breath, was short of breath with a little bit of exertion (including walking and climbing stairs), and that her blood pressure would sometimes drop, causing dizziness and/or requiring her to sit down. (*Id.* at pp. 18-19.)  As discussed in section VI.B.1.ii., *supra*, the ALJ specifically and appropriately addressed her subjective reports of dizziness and shortness of breath.  That issue will not be revisited here.

To the extent Ms. Walton is arguing that these subjective reports demonstrated that she needed additional breaks and rest periods, beyond those breaks typically available in a competitive workplace, the undersigned finds the argument lacks merit.  The subjective allegations indicate Ms. Walton is limited by her symptoms when she exerts herself, stands, walks, or climbs stairs.  The ALJ accounted for those stated limitations when he restricted her to sedentary exertional work with limited standing, lifting, carrying, and climbing. (Tr. 22, 25.) Even if substantial evidence supported an argument that the evidence shows a need for additional breaks in a sedentary job, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Ms. Walton has not shown that the ALJ lacked substantial evidence to support his finding that she could perform sedentary work, as described in the RFC, without additional breaks.

Ms. Walton's citation to the October 2021 functional capacity examination ("FCE") does not change this analysis. (ECF Doc. 8, pp. 19-20.)  Ms. Walton notes that the ALJ found the

FCE findings persuasive, even though "the FCE documented that [she] had consistent limitations relating to shortness of breath and fatigue."  (*Id.* at p. 19 (citing Tr. 26, 729-37).)

It is true that the ALJ found the FCE persuasive.[2]  (Tr. 26.)  It is also true that the FCE report noted Ms. Walton "had consistent limitations relating to [shortness of breath] and fatigue" and "experienced more [shortness of breath] and fatigue, limiting her ability with stairs and ladder climbing."  (Tr. 730.)  But the FCE report ultimately opined—despite her stated limitations due to shortness of breath and fatigue—that Ms. Walton could frequently sit and occasionally stand, walk, crouch, kneel, or climb stairs and ladders.  (Tr. 731.)  The FCE also found Ms. Walton capable of lifting, carrying, pushing, and pulling weights that exceed general sedentary exertional limitations.  (*Id.*)  Ms. Walton has not identified any opinion within the FCE report indicating that she requires breaks or rest periods exceeding those generally available in a competitive workplace, and the undersigned is aware of no such opinions.  Given that the FCE report found Ms. Walton capable of performing sedentary work, with lifting, carrying, and climbing abilities greater that those ultimately adopted by the ALJ in the RFC, the undersigned cannot find that the contents of the FCE report deprived the ALJ of substantial evidence to support his finding that Mr. Walton did not require additional breaks under the RFC.

For the reasons set forth above, the undersigned finds the ALJ was supported by substantial evidence in finding Ms. Walton's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence of record, and Ms. Walton has not met her burden to demonstrate that the ALJ lacked such support.

---

[2] To the extent Ms. Walton intended to challenge the ALJ's persuasiveness finding as to the FCE, the undersigned finds the argument to be underdeveloped and accordingly waived.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006); *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

### 2.      Whether ALJ Erred by Failing to Consider Frequency of Treatment

Ms. Walton also argues that the ALJ did not appropriately consider "the frequency of treatment and potential for absenteeism" in adopting the RFC.  (ECF Doc. 8, p. 17.)  In support, she contends that her medical appointments, as reflected in the evidentiary record, included "22 days of appointments in 2021 and 12 days of appointments in the first six months of 2021."  (*Id*.)  She acknowledges that she "would not necessarily miss full days of work on every day she had an appointment," but asserts that "there is no evidence in the record that [she] did *not* require th[at] amount of appointments for the management of her chronic conditions."  (*Id.* at pp. 17-18 (emphasis added).)  In other words, she appears to argue that this Court should assume her medical appointments would have required her to be absent from work more than one day per month—the threshold upon which the VE testified there would be no competitive jobs—because there is no evidence in the record proving the contrary.  That is not the standard.

A claimant's RFC "is the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 404.1546(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.")*; Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").  The ALJ's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  That means this Court cannot overturn those findings "so long as substantial evidence . . . supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  Ms. Walton's assertion that this Court should assume her appointments required her to be absent more than one day per month, because there is no specific evidence

proving the contrary, turns that standard on its head.  The question here is whether there was substantial evidence in the record to support the ALJ's finding that Ms. Walton could perform work consistent with the RFC.  This Court need not, and indeed should not, start with an assumption that she would necessarily be absent every day she had a medical appointment.

In support of her argument that the ALJ should have found her absenteeism would exceed one day per month, Ms. Walton points to the following statements from her medical providers:

- Office visit notes for September 1, 2021, where PA Mendenhall noted: "pt is pursuing disability which I do believe she is an approp candidate given her extensive health history" (Tr. 1524)

- Office visit notes for September 22, 2021 and April 5, 2022, where PA Mendenhall noted: "pt is pursuing disability which I do believe she is an approp candidate given her extensive health history – unfort she was denied but I question if they received all the approp info on patient" (Tr. 1534, 1615)

- Further notes from the April 5, 2022 office visit that FMLA paperwork for intermittent leave was completed for Ms. Walton's husband "as she at times needs assistance with appointment given her multiple health conditions" (Tr. 1615);

- A July 27, 2022 letter from PA Mendenhall saying Ms. Walton "suffers from multiple medical conditions and needs to follow often with specialists to help manage these conditions and improve her quality of life," and asking the recipient to "[p]lease take all this into consideration as you review her disability case" (Tr. 1716); and

- An August 16, 2022 letter from Dr. Bajwa stating that Ms. Walton had "multiple long-term complications" of her childhood lymphoma and blood and marrow transplantation and followed with "various medical providers at Columbus, Mansfield and Cleveland" (Tr. 1717).

(ECF Doc. 8, p. 18.)  Ms. Walton argues that the ALJ also erred by "fail[ing] to provide an explanation as to why the [absenteeism] limitations were not included in the RFC finding."  (*Id.*)  The Commissioner responds that the ALJ appropriately addressed the statements of Ms. Walton's providers and asserts that Ms. Walton "has not explained how the evidence required the ALJ to come to a different conclusion."  (ECF Doc. 10, pp. 6-7.)

It is undisputed that the ALJ addressed the July 2022 letter from PA Mendenhall and the August 2022 letter from Dr. Bajwa in his decision, where he explained that he had considered the statements of Ms. Walton's medical providers "documenting their treatment of the claimant and her various diagnoses" but concluded: "These statements do not offer any opinion as to the claimant's limitations resulting from her conditions."  (ECF Doc. 26 (citing Tr. 1716, 1717).)

The ALJ's language clearly references the regulatory definition of "medical opinions," which the ALJ is required to evaluate for persuasiveness under the regulations.  *See* 20 C.F.R. § 404.1520c(a) (outlining how "medical opinions" are evaluated for persuasiveness).  A "medical opinion" is "a statement from a medical source about what [a plaintiff] can still do despite [her] impairment(s) and whether [she] ha[s] one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands or work, or to adapt to environmental conditions.  20 C.F.R. § 404.1513(a)(2).[3]

While an ALJ must address the persuasiveness of all medical opinions, *see* 20 C.F.R. § 404.1520c(a), he need not specifically discuss all medical evidence in the record, *see Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006)).  Ms. Walton has not argued that the ALJ erred in finding the letters from PA Mendenhall and Dr. Bajwa were not "medical opinions" requiring analysis under Social

---

[3] In contrast, a medical source's "judgments about the nature and severity of . . . impairments, . . . medical history, clinical findings, diagnosis, treatment prescribed with response, [and] prognosis" are classified as "[o]ther medical evidence."  20 C.F.R. § 404.1513(a)(3).

Security regulations,[4] and the undersigned finds that the ALJ's conclusion to this effect was supported by substantial evidence.

The undersigned further notes that the ALJ was not required to address the statements by PA Mendenhall that Ms. Walton is an appropriate candidate for disability given her extensive health history, since the regulations establish that any "[s]tatements on issues reserved to the Commissioner," such as to whether a person is or is not "disabled, . . . able to work, or able to perform regular or continuing work," are "inherently neither valuable nor persuasive."  20 C.F.R. § 404.1520b(c)(3)(i).  The ALJ was not required to "provide any analysis about how [he] considered such evidence in [his] determination or decision."  20 C.F.R. § 404.1520b(c).

Setting aside the "neither valuable nor persuasive" statements that Ms. Walton was an appropriate candidate for disability, and accepting the ALJ's finding that the two provider letters were not "medical opinions," the question that remains for determination here is whether the ALJ lacked substantial evidence to support his RFC finding because of (1) the number of medical appointments in the record and (2) the general statements of her practitioners that she had "an extensive health history" (Tr. 1524, 1534, 1615), "suffer[ed] from multiple medical conditions and need[ed] to follow often with specialists to help manage these conditions" (Tr. 1716), and had "multiple long-term complications" and followed with "various medical providers at Columbus, Mansfield and Cleveland" (Tr. 1717).  On the other side of this general evidence were the opinions of the state agency medical consultants—based on a review of the medical records—that Ms. Walton could perform light exertional work (Tr. 67-69, 77-79, 89-91, 99-101) and the opinion in the FCE—based on an in-person examination—that she could

---

[4] Any intended argument that the ALJ erred in finding the letters were not "medical opinions" was not sufficiently developed and is deemed waived.  *See Hollon*, 447 F.3d at 491; *see also McPherson*, 125 F.3d at 995.

perform sedentary exertional work (Tr. 731-33).  None of these three opinions opined that Ms. Walton would be limited by absenteeism.

Given this opinion evidence, the undersigned finds Ms. Walton has not met her burden to show that the ALJ lacked substantial evidence to support the RFC or failed to adequately explain the basis for his RFC.  Accordingly, and for the additional reasons set forth in section VI.B.1., *supra*, the undersigned finds that Ms. Walton's first assignment of error lacks merit.

## C.     Second Assignment of Error: Whether ALJ Properly Evaluated Psychological Opinion Evidence and Identified Substantial Evidence Supporting the RFC

In her second assignment of error, Ms. Walton argues first that the ALJ erred when he failed to incorporate social limitations from the medical opinions of the state agency psychological consultants and the psychological consultative examiner into the mental RFC. (ECF Doc. 8, pp. 20-23.)  Next, Ms. Walton argues that the ALJ relied on insufficient evidence to support his physical RFC findings and "should have requested an opinion from a treating medical source, obtained a consultative examination, or obtained a medical expert" to support the physical RFC because "[t]he record does not contain a medical expert's interpretation of the records" relied on by the ALJ in support of his physical RFC findings.  (*Id.* at pp. 23-25.)

### 1.     Whether ALJ Appropriately Evaluated Medical Opinion Evidence

Ms. Walton argues that the ALJ erred in evaluating the medical opinions of the state agency psychological consultants and the consultative psychological examiner because he did not adopt social limitations from those opinions into the mental RFC and failed to explain how the evidence was insufficient to support social limitations.  (ECF Doc. 8, pp. 20-23.)  The Commissioner responds that the evidence supported the ALJ's conclusion that the record did not support the inclusion of social limitations in the RFC.  (ECF Doc. 10, pp. 7-9.)

###### i.      Legal Framework for Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 416.920c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 416.920c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 416.920c(a), 416.920c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 416.920c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

The undersigned turns to whether the ALJ's evaluation of the challenged medical opinions satisfied the regulatory framework for evaluation of medical opinion evidence.

### ii.      Whether the ALJ Appropriately Evaluated the Medical Opinions of the State Agency Psychological Consultants

The ALJ evaluated the persuasiveness of the medical opinions of state agency psychological consultants Drs. Tangeman and Rivera as follows:

> The undersigned considered the State agency . . . psychological consultant opinions . . . , limiting the claimant to . . . mental limitations similar to those adopted herein. . . . The psychological opinions are persuasive with respect to limiting the claimant to routine tasks in an environment where changes are expected and explained. Such limitations are consistent with the claimant's history of anxiety and depression and potential for decreased ability to focus and concentrate as well as handle work pressures. Thus, <u>the undersigned finds these opinions persuasive</u>; <u>however, the undersigned does not find support for the social limitations indicated by the State agency as there is no evidence that the claimant has any difficulty interacting with others</u>.

(Tr. 25-26 (citations omitted) (emphasis added).)  Both state agency psychological opinions limited Ms. Walton to superficial interactions with others.  (Tr. 70, 80, 92, 102.)

Ms. Walton contends that the ALJ was "too conclusory" in finding the record did not support social limitations, and that he failed to identify evidence inconsistent with the described social limitations.  (ECF Doc. 8, p. 22.)  But a review of the ALJ decision reflects that he found at Step Two that Ms. Walton had "mild" limitations in interacting with others, supported in part by her "unremarkable social presentation" at the consultative psychological examination, with cooperative behavior and normal speech, and her report to the consultative examiner that "she does well with people."  (Tr. 21-22 (referencing Tr. 705-09).)  The ALJ then noted at Step Four that Ms. Walton's mental health treatment was "limited to psychotropic medication prescribed by her primary care provider," as she had "never seen a mental health professional on an outpatient basis for treatment," and that she had not "required emergency treatment for acute mental symptom[] exacerbations or hospitalization for periods of mental instability."  (Tr. 25.)

43

The ALJ also highlighted her mental status findings at the consultative examination, including her appropriate affect and good eye contact.  (*Id.*)

It is in the context of this prior discussion of the evidence that the ALJ explained that he did not find support for social limitations because "there is no evidence that the claimant has any difficulty interacting with others."  (Tr. 26.)  Given that the evidentiary record reflects only limited mental health treatment, normal mental status findings, and self-reports of doing well with people, the undersigned finds the ALJ's analysis as to the social limitations in the state agency opinions was sufficiently articulated and supported by substantial evidence.

Ms. Walton argues that the ALJ erred in finding of "no evidence" to support social limitations because the medical records indicate she had anxiety and depression, took medications for mood, had mood changes, and reported fatigue throughout the record.[5]  (ECF Doc. 8, pp. 22-23 (citing records).)  She also argues that the ALJ "failed to explain how the above evidence is insufficient to support the social limitations."  (*Id.* at p. 23.)  But the ALJ explained that the evidence was insufficient to support social limitations because "there is no evidence that the claimant has any difficulty interacting with others."  (Tr. 26.)  This finding was supported by her limited treatment, her unremarkable social presentation on mental status examination, and her own report that she did well with people, as outlined by the ALJ earlier in his decision.  (Tr. 21-22, 25, 26.)  Although symptoms of anxiety or depression could impact a person's ability to interact with others, the mere existence of those conditions or related symptoms does not, alone, constitute evidence of difficulty interacting with others.

---

[5] Ms. Wagner's additional argument that Dr. Tanley's medical opinion also supports social limitations will be addressed in section VI.C.1.iii., *infra*

For the reasons set forth above, the undersigned finds Ms. Walton has not met her burden to show that the ALJ's analysis of the medical opinions of the state agency psychological consultants lacked the support of substantial evidence or was inadequately articulated.

### iii.    Whether the ALJ Appropriately Evaluated the Medical Opinion of the Psychological Consultative Examiner

The ALJ evaluated the persuasiveness of consultative examiner Dr. Tanley as follows:

> The undersigned considered the psychological consultative examiner's report []. He did not offer specific work-related limitations but indicated that the claimant's depression and anxiety could negatively impact her ability to focus and concentrate and tolerate work pressures. To the extent this opinion is consistent with the limitations adopted herein and supported by the examiner's clinical examination and the claimant's history, it is persuasive.

(Tr. 26 (internal citations omitted) (emphasis added).)

Ms. Walton argues that the ALJ failed to address "consistency" in his persuasiveness analysis for Dr. Tanley because his opinion—specifically, that Ms. Walton's "current mood problems, anhedonia, and/or anxiety could make the free and easy commerce of social interaction on the job slightly problematic" (Tr. 709)—undermines the ALJ's prior finding of "no evidence that the claimant has any difficulty interacting with others" (Tr. 26), and because the social limitations in the state agency medical opinions were consistent with Dr. Tanley's stated limitations.  (ECF Doc. 8, p. 22.)

In considering this argument, the undersigned returns to the regulatory definition of medical opinions as "statement[s] from a medical source about what [a plaintiff] can still do despite [her] impairment(s) and whether [she] ha[s] one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands or work, or to adapt to environmental conditions.  20 C.F.R. § 404.1513(a)(2).  Rather than describing specific social limitations caused by Ms. Walton's mental impairments, Dr. Tanley opined only that her mental impairments "could" make free and easy social interactions "slightly problematic."  (Tr.

26.)  The ALJ appropriately found that this functional assessment did not include "specific work-related limitations."  (Tr. 26.)  It was therefore not a medical opinion for which the ALJ was required to provide a persuasiveness analysis, 20 C.F.R. § 404.1520b(c), and the ALJ did not err in failing to adopt social limitations in the RFC based on the findings in the functional assessment.

For the reasons set forth above, the undersigned finds Ms. Walton has not met her burden to show that the ALJ's analysis of the consultative examiner's functional assessment lacked the support of substantial evidence or was inadequately articulated.

### 2. Whether ALJ Erred by Not Obtaining Further Opinion Evidence

In her final argument, Ms. Walton asserts that the ALJ relied on insufficient evidence to support the physical RFC and failed to adequately explain how the evidence supported the RFC. (ECF Doc. 8, pp. 23-24.)  Specifically, she argues that "[t]he record does not contain a medical expert's interpretation of the records now deciphered by the ALJ" and the ALJ should therefore have "requested an opinion from a treating medical source, obtained a consultative examination, or obtained a medical expert to review the complete medical history."[6]  (*Id.* at pp. 24-25.)

An ALJ must determine a claimant's RFC based on all the relevant evidence in the record.  *See* 20 C.F.R. §§ 404.1545(a)(1); 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  That includes medical opinion evidence.  But an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."  *Poe*, 342 F. App'x at 157.  Indeed, the Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a

---

[6] Ms. Walton also reiterates her argument from the first assignment of error that the ALJ failed to identify evidence inconsistent with her allegations of shortness of breath, fatigue, and dizziness.  (ECF Doc. 8, p. 24.)  That argument was addressed in section VI.B.1, *supra*, and will not be revisited here.

physician offers an opinion consistent with that of the ALJ." *See Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) (finding an ALJ did not have a duty to obtain an additional medical opinion despite giving "no weight" to the relevant medical opinions) (citing *Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x 435, 442–43 (6th Cir. 2017); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)). As the Sixth Circuit has explained, requiring an ALJ to base his RFC on a medical opinion would effectively confer on medical providers "the authority to make the determination or decision about whether an individual is under a disability," which "would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd*, 531 F. App'x at 728 (internal quotation and citation omitted). Further, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 342 F. App'x at 157.

Here, as outlined in section VI.B.1.ii., *supra*, the ALJ considered Ms. Walton's subjective complaints, her medical treatment records, and the medical opinion evidence in support of his finding that Ms. Walton can perform a reduced range of sedentary work. (Tr. 22-26.) He considered the opinions of the state agency medical consultants—based on a review of the medical records in evidence at the administrative stage—that she could perform a reduced range of light work (*see* Tr. 67-69, 77-79, 89-91, 99-101) but found "the evidence as a whole documenting [her] ongoing complaints of shortness of breath with mild to moderate exertion" warranted a reduction to sedentary work (Tr. 25). He also considered the opinion in the FCE that Ms. Walton could perform sedentary work with some greater lifting and carrying abilities (*see* Tr. 729-37) but opined that "the record better supports further lifting limitations given the evidence of the claimant's dyspnea on exertion" (Tr. 26). He explained that the RFC restricting

47

Ms. Walton to a limited range of sedentary work was appropriate "given the nature and extent of the combination of her cardiac history, ongoing shortness of breath, deconditioning and potential for fatigue and dizziness related to diabetes, hypotension and chronic kidney disease."  (Tr. 25.)

Even though there are three medical opinions regarding Ms. Walton's physical capabilities that were explicitly considered by the ALJ in adopting the physical RFC, Ms. Walton argues that the ALJ's RFC finding "is an improper substitution of his lay opinion for that of medical evidence" as the record "does not contain a medical expert's interpretation of the records now deciphered by the ALJ."  (ECF Doc. 8, p. 24.)  This argument is unsupportable for several reasons.  First, the physical RFC is based on three medical opinions, all of which call for fewer limitations than those adopted by the ALJ in the RFC.  Second, Ms. Walton fails to specifically identify what records were "deciphered" by the ALJ in the physical RFC but not considered by the medical experts.  *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x. 997, 1002 (6th Cir. 2011) ("There is no categorical requirement that the non-treating source's opinion be based on a complete or more detailed and comprehensive case record.") (internal citations and quotations omitted).  And finally, the argument that the ALJ was required to obtain new medical opinion testimony is both inadequately developed and unsupported by applicable law.  *See Mokbel-Aljahmi*, 732 F. App'x at 401 (finding the Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ").

The Sixth Circuit provides that it is within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary."  *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative

48

specialist, but simply grant [her] the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."); *see also Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty to develop the record" does not necessarily "require the ALJ to order a consultative examination").[7]  Here, Ms. Walton has failed to show that the ALJ lacked authority to adopt the RFC without obtaining further evidence, and has failed to demonstrate that the ALJ lacked substantial evidence to support her RFC finding.

For the reasons explained above, the Court finds Ms. Walton has failed to show that the ALJ was obligated to develop the record by obtaining additional medical opinion evidence, or that her RFC finding otherwise lacked the support of substantial evidence.  Accordingly, the undersigned finds Ms. Walton's second assignment of error is without merit.

## VII.   Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's final decision.


June 25, 2024


                                   /s/Amanda M. Knapp
                                   _____
                                   AMANDA M. KNAPP
                                   United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 Dated: April 17, 2023(1985).

---

[7] The regulations indicate a consultative examination may be appropriate "to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis," where such evidence is not contained in a medical source's records or where the medical source's evidence "cannot be obtained for reasons beyond [the claimant's] control."  20 C.F.R. § 404.1519a(b).